**Ida Kathleen MINCEY, et al.,
Plaintiffs-Appellants,**

v.

**Anthony G. BLANDO, D.O., and Bernard
S. Gould, D.O.,
Defendants-Respondents.**

**No. WD32945.**

Missouri Court of Appeals,
Western District.

May 31, 1983.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Aug. 2, 1983.

Application to Transfer Denied
Sept. 20, 1983.

Larry M. Brummet, Lantz Welch, Kansas City, for plaintiffs-appellants.

Roy Larson, Robert A. Schroeder, Theodore J. Furry, Russell D. Jacobson, Kansas City, for defendant-respondent Gould.

Larry L. McMullen, Shirley Ward Keeler, Carol R. Gilham, Kansas City, Attys. for defendant-respondent Blando.

Before WASSERSTROM, P.J., and TURNAGE and CLARK, JJ.

WASSERSTROM, Presiding Judge.

Plaintiff Ida Mincey sues for personal injury and her husband Maurice Mincey sues for loss of consortium, arising from alleged medical malpractice by defendants Dr. Gould and Dr. Blando. A jury trial resulted in a verdict for both defendants. From judgment accordingly, plaintiffs appeal.

Contrary to the argument by defendant Gould, we hold: (1) Plaintiffs made a submissible case against him, and (2) the trial court erred in admitting the deposition of Gould taken on written questions. We therefore reverse and remand for a new trial as to defendant Gould. Contrary to the arguments by plaintiffs, we hold that there was no error as to defendant Blando: (1) the admission of the Gould deposition was immaterial and nonprejudicial with respect to plaintiffs' claim against defendant Blando; (2) permission for the whole of Exhibit 23 to be delivered to the jury room was not reversible error; and (3) the inadvertent delivery of only part of the exhibits, those consisting of only defendants' exhibits, and permitting those exhibits to be in

the jury room for 20 to 30 minutes before being taken out, was not reversible error.

Defendant Gould is a general practitioner whom Mrs. Mincey and her family had consulted and by whom they had been treated for a number of years. In the fall of 1974 Mrs. Mincey suffered from pelvic pain and excessive uterine bleeding. Gould administered a series of four injections of progesterone, commencing November 2, 1974, in order to try to stop the bleeding. The last of the injections occurred on November 26, 1974, on which date Gould also performed a pelvic examination. Gould testified that at that time Mrs. Mincey's uterus felt slightly enlarged and he suspected a fibroid uterus. At that point, Gould referred Mrs. Mincey to Blando, a specialist in obstetrics and gynecology.

On November 27, 1974, Blando examined Mrs. Mincey and diagnosed a uterine tumor the size of a grapefruit. He recommended a hysterectomy to remove the reproductive organs which would include the elimination of the suspected tumor.

On December 1, 1974, Mrs. Mincey entered the hospital and Blando operated. Upon opening her abdomen, he did not find any tumor but instead found omental adhesions. Blando nevertheless determined that a hysterectomy was indicated and he did perform that procedure.

After dismissal from the hospital following the hysterectomy, Mrs. Mincey suffered stomach complications and on December 11, 1974, she was again admitted to the hospital by Blando. Blando diagnosed a bowel obstruction and recommended surgery for that condition. Upon opening the abdomen, he found a mechanical obstruction of the small intestine with adhesions. He freed the adhesions and removed a portion of the intestine.

Following this second surgery, Mrs. Mincey's condition began to deteriorate rapidly. She experienced more and more lower abdominal pain, could not stand up straight, could not sit for any period of time, began losing weight, could not perform her daily tasks at home and at work, and found inter-course with her husband to be extremely painful.

Thereafter Mrs. Mincey consulted and was treated by a series of doctors. In September 1975 Dr. Tutera performed exploratory surgery. Upon opening the abdomen, he found massive adhesions present to an extent so great that no surgical cure was considered possible. In Tutera's opinion, these adhesions were the result of prior surgery. During this operation, Tutera observed what he thought were talc granulomas and he was of the opinion that they had been caused by talcum from the gloves of Blando during his previous surgery. Tutera testified that the hysterectomy should not have been performed. He further testified that progesterone was an improper drug to be administered in this case of Mrs. Mincey's undiagnosed genital bleeding.

Defendants Gould and Blando introduced extensive expert testimony to justify their respective courses of medical action. They also introduced substantial evidence to prove that Mrs. Mincey's present complaints do not have any physical basis, but rather have an origin from a psychological mental condition.

For her points on appeal, Mrs. Mincey claims: (1) a deposition taken of defendant Gould by his lawyer on written questions should not have been permitted into evidence; (2) that all of Exhibit 23, consisting of Gould's office records, should not have been delivered to the jury room in full, but rather only portions thereof; and (3) the court erred in permitting a part of the exhibits, those being only of the defendants, to be sent to the jury room and allowed to remain there for some 30 minutes before they were withdrawn from the jury room.

Defendant Gould counters with a contention that none of those trial errors have any materiality as to him, for the reason that plaintiffs failed to make a submissible case against him. This contention by Gould will be considered first, after which each of the plaintiffs' contentions will be considered in order.

## I.

### *Submissibility of the Case Against Gould*

██ Gould argues that he is not responsible for the acts of Blando and therefore cannot be liable for Blando's allegedly negligent hysterectomy. This argument rests upon a proper general principle of law. As stated in 61 Am.Jur.2d *Physicians, Surgeons, etc.* Section 295 (1981): "A referral of a patient by one physician to another competent physician, absent partnership, employment, or agency, does not impose the liability on the referring physician." *See Crump v. Piper,* 425 S.W.2d 924 (Mo.1968); *Gross v. Robinson,* 203 Mo.App. 118, 218 S.W. 924 (1920). The above general rule has been announced and followed throughout the country. *Dahlberg v. Ogle,* 268 Ind. 30, 373 N.E.2d 159 (1978); *Llera v. Wisner,* 171 Mont. 254, 557 P.2d 805 (1976); *Rodgers v. Canfield,* 272 Mich. 562, 262 N.W. 409 (1935); *Scruggs v. Otteman,* 640 P.2d 259 (Colo.App.1981); *Stovall v. Harms,* 214 Kan. 835, 522 P.2d 353 (1974); *Graddy v. New York Medical College,* 19 A.D.2d 426, 243 N.Y.S.2d 940 (1963); Harney, *Medical Malpractice,* Section 6.2 (1973); 1 D. Louisell & H. Williams, *Medical Malpractice,* Sections 16.04, 16.06 (1982); Annot., 85 A.L.R.2d 889 (1962). That rule applies here to preclude liability on the part of Gould for the hysterectomy performed by Blando. The evidence shows clearly that Gould merely referred the patient to Blando, Blando thereupon assumed responsibility, and Gould did not participate in nor was he even present at the operation. There is no contention that Gould was negligent in his selection of Blando for referral, nor is there any claim that Gould and Blando were associated in any partnership, agency or employment arrangement. Further, all of the expert medical witnesses were in agreement that Blando had the exclusive responsibility for deciding upon the hysterectomy and for the manner in which it was performed.

██ The foregoing principle, however, does not serve to completely exonerate Gould. His argument leaves out of account that plaintiffs' case against him rests not solely upon the allegation that Gould negligently advised the hysterectomy, but also upon an independent ground that Gould wrongly and negligently administered the series of four progesterone injections. Plaintiffs introduced substantial evidence that progesterone was contraindicated in the case of undiagnosed genital bleeding, and even Gould himself admitted that at least the last of the four injections of progesterone was not good medical practice.

It is true that Gould's experts testified that the administration of the progesterone was a valid treatment and did Mrs. Mincey no physical harm. On the other hand, however, plaintiffs' expert witness Tutera testified to the contrary. This conflict of expert testimony presented a factual issue for jury determination.

Both at trial and also in this court plaintiffs have undertaken to attribute joint liability to both Gould and Blando for the results of the hysterectomy, and plaintiffs made no real effort to establish damages for the administration of progesterone separate from damage resulting from the hysterectomy. Under settled law, Gould cannot be held liable with respect to any negligence which may have occurred on the part of Blando. The submission at retrial should therefore be confined to the questions of liability and damage, if any, resulting from the administration of progesterone.

## II.

### *The Deposition on Written Questions*

██ In June 1978 plaintiffs' attorney had taken Gould's deposition. At that time plaintiffs' attorney had been supplied with a copy of Gould's office records which showed that Gould had conducted a pelvic examination on November 26, 1974, as a result of which a notation was made: "Uterus felt slightly enlarged and possible fibroid." In the 1978 deposition, Gould stated that notation was made at the time of the examination. The deposition necessarily proceeded upon the basis of that notation and the assumption that it was made contemporaneously.

Subsequently plaintiffs' counsel discovered that the notation quoted was not made contemporaneously with the rest of the record, but rather was inserted at a subsequent time. Upon making this discovery, plaintiffs' attorney sought to take a supplemental deposition in order to probe the reasons for and the circumstances surrounding Gould's alteration of his original record. By that time, however, Gould had developed a heart condition and his attending physician reported that the taking of a deposition would create stress and might be life threatening.

This case attained a trial setting in March of 1981, and Gould's condition continued to be such that it was quite apparent he could not appear in court as a witness. His attorneys therefore gave notice to plaintiffs' attorney that they intended to take Gould's deposition upon written questions, since they had not asked any questions of Gould at the time of the 1978 deposition. The proposed deposition on written questions became postponed because of vacation schedules and subsequently was again postponed because of an erroneous notice from the court that the trial setting would have to be changed to a subsequent date in another division.

When this case was restored to the trial docket and the parties notified that trial would in fact be held on Monday, April 13, 1981, Gould's attorney proceeded to take the deposition in question upon written questions. No notice was given to plaintiff's attorney until Thursday, April 9, at which time a portion of the answers were delivered. The next day, April 10, a pretrial conference was held before the trial judge, on which date the balance of the questions and answers were delivered to plaintiffs' attorney and Gould's attorney also filed with the court a motion for a continuance.

Plaintiffs' attorney objected both to the admission of the deposition on written questions and also to any continuance of the trial setting. He insisted on a right to challenge whether Gould was actually available, and he also strenuously objected to the introduction of this deposition which had been taken without compliance with the requirements of Rules 57.04 and 57.05. Notwithstanding the noncompliance with those rules, the trial court held that the questions and answers would be accepted in evidence subject to a continuance if plaintiffs' attorney wanted one and with the further understanding that plaintiffs would be permitted to submit cross questions which the court would order Gould to answer promptly. Plaintiffs' attorney declined any continuance on the ground that he had already waited approximately four years for a trial setting, and he further stated that the proposal that he prepare and submit cross questions was an inadequate solution inasmuch as the case had already reached the eve of trial and his time was in demand for study of numerous documents and last minute interviewing of many witnesses. Notwithstanding those objections, the trial court ruled:

"I am going to rule that these may be admitted subject to the understanding that there may remain an objection to any question or questions which are believed to be bad, or to any answers as not being responsive as far as that's concerned, or any of the other objections which would normally be open. And with the understanding also that Mr. Welch would have whatever opportunity he might with, and within the confines of time of the trial that would be afforded to him, to submit other written interrogatories to be answered, and that the time would be drastically shortened for that to occur because it would have to be. We can't operate on a 30-day basis or anything like that.

And we could make that as an official ruling, and it's understood that you object to the ruling, Mr. Welch, and you could preserve that, of course, because I'm not at all sure that I'm right. I only try to be right."

The trial court's solution to this situation cannot be approved. Rule 57.04 requires that a deposition on written questions be accomplished according to written notice

and that the opposing party be given 30 days within which to submit cross questions, with further opportunity thereafter for redirect and recross questions. Those requirements were not met by the procedure followed here. Furthermore, Rule 57.-05 forbids the deposition on written questions to be taken before the attorney or counsel for any of the parties. In violation of that rule, these questions were propounded to Gould by his attorney and the answers were written down by Gould's attorney after conference between them. A "deposition" taken in such gross violation of the rules should not be accepted into evidence. Under facts much less violative of the parallel federal rules, it was held that a deposition on written questions was contrary to the letter and spirit of Federal Rule 31 and that it was error to allow it into evidence. *Lipscomb v. Groves,* 187 F.2d 40 (3d Cir. 1951). *See also Durandy v. Fairmont Roosevelt Hotel, Inc.,* 523 F.Supp. 1382, 1383 n. 1 (E.D.La.1981).

Gould's attorney did have a legitimate problem, and the trial court had an available solution by granting Gould a continuance as his attorney had requested. The court, however, had no authority to disregard the fact that the request for continuance was made by Gould, and instead treat the situation as if the request had been made by plaintiffs. No authority has been cited nor has any been found whereby a "deposition" so grossly improperly taken as here can be admitted unless the party against whom it is offered agrees to conditions at total variance with the rights granted him under the rules.

Rule 57.04(a) does provide that a trial court may for cause shown enlarge or shorten the time for submitting cross, redirect or recross questions. The court here, however, did not purport to act under that provision. Furthermore, any attempt to shorten the time for cross questions here under the rule cited, so as to require plaintiffs to formulate that important examination while actively engaged in actual trial of this difficult and vigorously contested lawsuit, would have been an abuse of discretion.

Defendants argue in this court that any error with respect to the admission of these questions and answers was harmless because the testimony in question was merely cumulative to other testimony given in the case. That argument ignores that a substantial reason for taking the supplemental deposition on written questions was to give Gould a chance to explain his alteration of his own office records at a time subsequent to the original preparation. The fact of that alteration went to his basic credibility and to his professional integrity. His own testimony in this regard stands on a completely different footing therefore from any other testimony in the case. The importance of Gould making an explanation in this regard as well as giving other evidence was voiced by his own attorney at the pretrial conference of April 10, 1981: "It would be tying both our arms behind our back if we weren't permitted to ask the questions we wanted to of our own client, and that's precisely what we have done by these interrogatories."

The supplemental deposition was more than cumulative for still another reason. As previously stated in this opinion, the expert medical witnesses gave conflicting testimony as to whether the progesterone injections were proper medical treatment and whether those injections did Mrs. Mincey any harm. In his supplemental deposition on written questions, Gould attempted to rationalize and justify his administration of progesterone. This had the effect of adding additional weight to the testimony on his side of the scale respecting this contested issue. While Gould's testimony on this issue can be called "cumulative" in one sense of the word, its net effect was important and prejudicial to plaintiffs. *Grath v. Mound City Roofing Tile Co.,* 121 Mo.App. 245, 98 S.W. 812 (1906); *Dorn v. St. Louis Public Service Co.,* 250 S.W.2d 859 (Mo.App. 1952). *In accord* 5 Am.Jur.2d *Appeal & Error* Section 800, l.c. 243 (1962).

We hold that the admission of these supplemental questions and answers was prejudicial to plaintiffs as regards their claim

against Gould, and that error requires reversal as to Gould.

■ The same result does not obtain, however, with respect to Blando. Just as Gould was not responsible for any negligence committed by Blando, so also Blando could not be responsible for any negligence committed by Gould. 61 Am.Jur.2d *Physicians, Surgeons, etc.* Sections 292, 294 (1981); Annot., 85 A.L.R.2d 889 (1962). *See also* the authorities cited in Section I of this opinion. Regardless of what Gould found or did not find, and regardless of any treatment which he gave or did not give, Blando had a wholly independent duty to examine Mrs. Mincey and it was completely up to him to make the controlling decision as to what the further treatment should be. Liability on his part can only rest on what Blando himself did on and after the date on which Mrs. Mincey was referred to him.

Plaintiffs intimate that Gould's explanation in the supplemental deposition on written questions concerning his alteration of his office records did affect their case against Blando, in that a diagnosis by Gould of a fibroid tumor of the uterus would tend to lead the jury to believe that Blando was justified in reaching a similar conclusion as a result of his pelvic examination prior to the surgery. Plaintiffs, of course, infer that Gould did not in fact make such a diagnosis, but rather added that by subsequent alteration of records. That inference is not well founded. Mrs. Mincey herself testified that before she went to see Blando, on the day Gould called Blando, he (Gould) told her that she "had a tumor and that I had to go down and have all my female organs taken out." She continued:

"Q. Now, did Dr. Gould actually call Dr. Blando in your presence about referring you down there?

A. Yes he did.

Q. What did he tell Dr. Blando?

A. He told Dr. Blando that I had a tumor and that I had to have a hysterectomy."

Moreover, Gould wrote in the Lakeside Hospital records dated December 1, 1974, at the time of Mrs. Mincey's admission: "Dr. A.

Blando checked patient and found fibroid uterus as I had in office." So there was abundant evidence that Gould had in fact diagnosed a fibroid tumor on November 26, 1974, regardless of the correctness of his office record made on that date. Accordingly, Gould's office record and his explanation of the alteration thereof was cumulative and basically immaterial so far as Blando is concerned.

### III.

### *Exhibit 23*

■ During the early course of the trial, plaintiffs offered a number of exhibits as a group as follows:

"I have discussed these exhibits with counsel, and they are for the record Plaintiff's Exhibits 23 through 29, and I make a limited offer of those exhibits, limited only to those material and relevant portions of same, reserving the right to make specific objections at the time each is offered, and assuming that the defendant would wish to offer that same type of . . . . That is my offer. Any objections?

MR. MCMULLEN: No objection, Your Honor, and we have had marked Defendants' Exhibits 30 and 31. 30 is this model and 31 this diagram. They are offered only for illustrative purposes.

THE COURT: And you have no objection?

MR. WELCH: No objection.

MR. FURRY: No objection.

THE COURT: Very well, they will all be received in evidence."

One of those exhibits, No. 23, consisted of Gould's office records. Thereafter during the trial plaintiffs' counsel no longer referred to Exhibit 23 as such, but instead placed before the jury and referred in examination to enlarged photographs mounted on cardboard of particular portions of Exhibit 23.

After the jury had retired to deliberate, they requested that the court send to the jury room Gould's records. Defense counsel proposed that all of Exhibit 23 be furnished.

Plaintiffs' counsel, on the other hand, insisted that only the blowups be sent to the jury room. The court ruled that the entire Exhibit 23 would be delivered to the jury, and it is to this ruling that plaintiffs' present point of error is directed.

We need not and do not rule the point as above defined. Whatever appeared in Gould's records affected only him. Whatever he did or did not do was not binding upon Blando, who had an independent duty to diagnose, evaluate and decide on the medical course to be followed. Therefore it is immaterial as to Blando whether all of Exhibit 23 or only portions thereof should have been sent to the jury room. While that question might be material as to Gould, we have already determined under Section II of this opinion that there must be a reversal as to Gould for another reason, and the present problem is unlikely to recur on retrial.

Furthermore, in their brief before this court plaintiffs contend that the importance of sending to the jury room all of Exhibit 23 lay in the fact that there were many references in that exhibit to various visits to Gould without identification as to whether the visit was by Mrs. Mincey or some other member of her family. Plaintiffs argue that these portions of Exhibit 23 might lead to the jury giving undue credence to defendants' argument that Mrs. Mincey was a hypochondriac with an unusual number of visits for medical advice and attention. If that in fact happened, that would be a matter influencing only the amount of damages. Inasmuch as the jury here found against plaintiffs on liability, it never reached the question of damages, and any error in the respect here complained of was immaterial.

### IV.

*Other Exhibits Sent to the Jury Room*

Immediately after the completion of trial, the parties agreed on what exhibits were to go to the jury room and that they should be delivered promptly the next morning. When the time came to take up the exhibits, the bailiff found that there were too many exhibits to carry in one trip, and he therefore gathered up as many as he could conveniently carry at one time. It just so happened that all of the exhibits which the bailiff gathered in that first batch consisted only of defendants' exhibits. When the bailiff arrived at the jury room, he was advised by the jury that they were in the process of voting and that they did not wish any further exhibits to be brought to them until that process was completed. He left the exhibits in question in the jury room and returned to the courtroom. Thereafter, some 20 to 30 minutes later, the bailiff returned to the jury room and retrieved those defendants' exhibits which had been left. At that time he saw one of the jurors leafing through the exhibits.

 This was a very minor incident which happened purely through inadvertence. Plaintiffs made no showing of prejudice and the trial court deemed this incident harmless. The only recourse the trial court had at that time other than to disregard the incident, would have been to declare a mistrial. A mistrial is generally discretionary and a denial will not be reversed except for abuse of discretion. *Hoene v. Associated Dry Goods Corporation*, 487 S.W.2d 479 (Mo. 1972). We see no abuse of discretion here.

The judgment is affirmed as to defendant Blando. The judgment is reversed and the cause remanded as to defendant Gould. Costs will be assessed one-half to plaintiffs and one-half to defendant Gould.

All concur.